**FILED**

**DEC 17 2024**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

# IN THE UNITED STATES COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### TOLEDO COURT

JANENE PRUITT
2336 South Avenue.
Toledo, Ohio 43609
      Plaintiff,

   vs.

EQUIFAX INFORMATION SERVICES LLC
1550 Peachtree Street Northeast
Atlanta, GA 30309;

EXPERIAN INFORMATION SOLUTIONS INC
475 Anton Boulevard
Costa Mesa, CA 92626;

TRANSUNION LLC
555 West Adams Street
Chicago, IL 60661;

      Defendants.

Plaintiff's Verified Complaint
Jury Demand Herein.

**3:24 CV 2190**

**JUDGE KNEPP**

**MAG JUDGE CLAY**

---

## PLAINTIFF'S VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

---

**NOW COMES**, JANENE PRUITT (hereinafter "Plaintiff"), bringing forth this complaint against Equifax Information Services LLC, Experian Information Solutions Inc, TransUnion LLC, (hereinafter individually referred to as "Equifax," "Experian," "TransUnion," and collectively as "NCRA's" and "Defendants"), Plaintiff asserts that Defendants have consistently failed to comply with the Fair Credit Reporting Act (hereinafter "FCRA"), which they are not exempt from. This Verified Complaint underscores the Defendants repeated failure to implement reasonable procedures for ensuring maximum accuracy and conducting adequate investigations as required by 15 U.S.C. § 1681e(b) and § 1681i *et seq.*

This Verified Complaint highlights the Defendants reliance on inadequate and unreasonable automated systems, including Online Solution for Complete and Accurate

Reporting ("e-OSCAR") and Automated Consumer Dispute Verification ("ACDV"). These systems systematically failed, leading to unreasonably investigated and inadequately resolved disputes raised by the Plaintiff through outsourced representatives during the investigative process. Ultimately, this led to documented failures to comply to the FCRA, which the Defendants are not exempt from or infallible.

Consequently, Defendants maintained inaccurate, unverifiable, and, in notable instances, blatantly fraudulent information on Plaintiff's credit reports. Despite clear legal obligations under the FCRA to conduct reasonable investigations and promptly delete such information, Defendants have shown reckless disregard for these duties, causing significant harm to Plaintiff's credit standing and financial health.  Under penalty of perjury, Plaintiff respectfully sets forth, complains, and alleges based on information and belief, the following:

# TABLE OF CONTENTS

Page

*PRELIMINARY STATEMENTS*.................................................................................... 6

*SUMMARY OF ALLEGATIONS* ............................................................................... 10

*NATURE OF COMPLAINT* ..................................................................................... 13

*JURSIDICTION AND VENUE* .................................................................................. 15

*PARTIES*............................................................................................................... 16

    *THE NATIONWIDE CONSUMER REPORTING AGENCIES* ................................. 17

*GENERAL FACTUAL ALLEGATIONS SUPPORTING CAUSE OF ACTION* ................... 17

    *Plaintiff, Janene Pruitt, Discover's Inaccurate, Derogatory and Unverifiable Information Reporting on Her Credit Reports.* ...................................................................... 21

    *Defendants Did Not and Does Not Conduct Any Investigation of Consumer Disputes.* ........... 25

    *Defendants Manipulation of Internal Procedures and Pattern of Fines for Unreasonable Practices.*............................................................................................................ 27

    *Plaintiff Ms. Pruitt Suffered Actual Harm.* ............................................................ 32

*CAUSE OF ACTIONS*............................................................................................... 37

*COUNT I*.............................................................................................................. 37

*COUNT II.*............................................................................................................ 38

*PRAYER FOR RELIEF* ............................................................................................ 39

## PRELIMINARY STATEMENTS

1.       In the intricate framework of our global financial system, trust, accuracy, fairness, and transparency are paramount. Central to these principles are consumer reporting agencies, with the Defendants being leading figures in the industry. Their prominence reflects the deep trust consumers, businesses, and institutions place in their capabilities. This trust is not given lightly; it comes with the strict understanding that Defendants will adhere to the federal mandates outlined in the FCRA, 15 U.S.C. §§ 1681e(b) and 1681i *et seq*. The FCRA is more than a set of rules; it represents a societal contract between consumers, like the Plaintiff, and consumer reporting agencies. Credit reports play a critical role in shaping financial futures and opportunities, influencing decisions such as securing housing or employment. Consumer reporting agencies, entrusted with this monumental task, are gatekeepers of countless opportunities.

2.       Credit reports are instrumental in shaping lives, influencing decisions regarding housing, employment, and financial opportunities. Defendants, as gatekeepers of these opportunities, bear a legal obligation to follow reasonable procedures to ensure maximum possible accuracy. This duty extends beyond simply repeating information from data furnishers.

3.       However, the Ms. Pruitt's experience reveals a stark failure by the Defendants to meet these obligations. Despite Ms. Pruitt's efforts to correct inaccurate and unverifiable information, Defendants responses have been inadequate, automated, and indifferent—prioritizing profits over compliance with the FCRA. These are not mere administrative oversights but systemic failures that deny consumers critical financial opportunities and cause significant harm, including emotional distress.

4.      The FCRA was enacted to ensure accurate credit reports. The FRCA thus required consumer reporting agencies ("CRAs"), like Experian, "to follow reasonable procedures to assure maximum possible accuracy." 15 U.S.C. § 1681e(b). The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from qualified "persons," or data furnishers.

5.      The Consumer Financial Protection Bureau ("CFPB") has noted, "experience indicates that [Defendants] lack incentives and under-invest in accuracy." *Consumer Fin. Prot. Bureau*, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Defendants have complied with its now 30-year-old obligation to conduct a reasonable investigation into consumer disputes. The Defendants have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both district and appellate courts to do more than an automated parroting of what its creditor-customers instruct.

6.      If a dispute about the information arises, the dispute is transmitted to the party furnishing the information through e-OSCAR, and the CRA must conduct a reasonable reinvestigation into the disputed status of the consumer's credit file. Inaccurate and unverifiable information must be deleted from the consumer's credit file. *E.g.*, 15 U.S.C. § 1681i (emphasis added).

7.      Defendants violated their obligations under 15 U.S.C. § 1681i(a)(1)(A) by failing to conduct a reasonable investigation into Ms. Pruitt's disputes concerning the accuracy of the furnished information. Defendants did not properly verify the accuracy of

the information, disregarding both the evidence provided by the CRAs and their statutory duty to investigate independently under §§ 1681i(a)(2)(A) and 1681i(a)(4).

8.    Defendants willfully reported and re-published materially inaccurate and unverifiable information, despite knowing it could not be substantiated. This conduct violated their obligation to correct, update, or delete inaccurate entries under §§ 1681i(a)(5)(A)(i)-(ii), 1681i(a)(6)(B)(i)-(v), and 1681i(a)(7).

9.    Defendants reported inaccurate, unverifiable and derogatory information to on Ms. Pruitt's credit report, thus violating 1681e(b). When she disputed the inaccuracies, Defendants did not reasonably investigate thereby violating, 1681i. Accordingly, Ms. Pruitt, brings claims against the leading nationwide reporting agencies for violating sections 1681e(b) and 1681i *et seq*.

10.    Defendants mail room employees would scan Plaintiff's mailed disputes and electronically forward them to third-party "investigational" representatives located outside of the United States. These ill-equipped  representatives would than conduct unreasonable ACDV "investigations" by selecting from pre-determined options in a drop-down menu through the e-OSCAR system. This flawed investigational process disregards the specific facts and evidence provided by consumers.

11.    From February 9, 2023, to the present, Defendants have engaged agents, employees, officers, and outsourced representatives—including foreign-based personnel—who, without sufficient training or supervision, were tasked with "investigating," consumer disputes with a few clicks of a button.

12.    Upon information and belief, one such arrangement involves Trans Union outsourcing dispute handling to Mumbai, India, through a third-party entity known as

Intelenet. This is just one instance, wherein Equifax, Experian, rely on outsourcing computer disputes to inadequately trained representatives to fulfill compliance obligations under the FCRA with minimal oversight. Intelenet would than directly connect to Trans Union's CRONUS database and initiate a dispute on a time sensitive quota system and compress Ms. Pruitt's complaint into generated codes and digits.

13.    As a result of these systemic failures, the Defendants reported inaccurate, unverifiable, and derogatory information about the Plaintiff. When Plaintiff disputed these inaccuracies, Defendants conducted perfunctory investigations that failed to meet the FCRA's requirements for reasonable procedures and accuracy.

14.    Had Defendants followed these legal commands, Ms. Pruitt would not have been harmed.

15.    As factual events unfold, the Plaintiff seeks not only redress for personal grievances but also to reaffirm the principles of trust, fairness, transparency, and maximum accuracy. This case underscores the broader implications of systemic lapses that affect millions of consumers. In standing up to these Defendants, the Plaintiff aims to ensure that the foundational trust in the credit reporting system remains unshaken.

16.    As factual events unfold, the Plaintiff seeks not only redress for personal grievances but also to reaffirm the principles of trust, fairness, transparency, and maximum accuracy. This case underscores the broader implications of systemic lapses that affect millions of consumers. In standing up to these Defendants, the Plaintiff aims to ensure that the foundational trust in the credit reporting system remains unshaken.

## SUMMARY OF ALLEGATIONS

17.     The Defendants—TransUnion, Equifax, and Experian—are the dominant consumer reporting agencies, entrusted with safeguarding the financial reputations of millions of consumers. As gatekeepers of credit, housing, and employment opportunities, Defendants hold immense power to shape individuals' lives. With this power comes the duty to ensure the accuracy, fairness, and completeness of consumer reports, as mandated by the FCRA, 15 U.S.C. §§ 1681e(b) and 1681i. Given this profound influence, any lapse in their duty can have cascading effects on individuals lives.

18.     Despite these statutory obligations, Defendants failed in their duties, causing profound harm to the Plaintiff. The inaccurate and unverifiable information on Plaintiff's credit file obstructed essential financial opportunities, including credit approvals and investment ventures critical to Plaintiff's economic future. Beyond financial damage, the Defendants' persistent noncompliance has caused severe anxiety and depression for the Plaintiff, necessitating medical intervention.

19.     The FCRA requires Defendants to conduct reasonable investigations when consumers dispute inaccurate or unverifiable information, as outlined in 15 U.S.C. § 1681i. Defendants did not comply with these mandates. Instead, they relied on automated systems, such as e-OSCAR, to handle Plaintiff's disputes. This system reduced Plaintiff's detailed dispute letters to simplistic numerical codes, disregarding the substance of Plaintiff's complaints and the evidence provided. Notably, Plaintiff explicitly requested that Defendants avoid automated tools like e-OSCAR, but Defendants ignored this directive.

20.    Depositions indicate that Defendants outsourced dispute processing to foreign representatives operating under rigid time quotas, often resolving disputes in under two minutes. These representatives did not adequately review the Plaintiff's documentation or forward it to data furnishers for verification. Defendants use of these flawed investigational processes reflects a systemic disregard for their legal obligations under 15 U.S.C. § 1681i(a)(1)(A).

21.    Upon information and belief, Defendants operate a 'VIP list', offering enhanced dispute resolution to select individuals, including:

i.      High-profile individuals, such as celebrities and politicians;

ii.     Company executives and employees of Defendants; and

iii.    Major shareholders and business stakeholders.

22.    Individuals on this list allegedly receive more thorough reviews and direct attention from U.S.-based employees or legal counsel, bypassing automated systems entirely. In contrast, Plaintiff's disputes like other consumers, were relegated to automated processing and clicks, compromising an "investigation," despite the complexity. This disparate treatment undermines the principles of " fairness... and impartiality" that the FCRA aims to protect. 15 U.S.C. § 1681(a)(4) (emphasis added)

23.    Despite receiving multiple detailed dispute letters and escalations through the CFPB portal, Defendants failed to conduct reasonable investigations. Instead, they parroted the inaccurate information provided by data furnishers without meaningful verification. The CFPB's January 5, 2022, report underscores these systemic failures, with Director Rohit Chopra stating that the "credit reporting oligopoly" lacks incentives to ensure fairness for consumers.

24.    The Defendants also exceeded the 30-day statutory deadline to resolve disputes under 15 U.S.C. § 1681i(a)(1)(A). By law, when a dispute is not resolved within this period, the inaccurate information must be promptly corrected or deleted under 1681i(a)(5). Defendants willfully failed to meet these obligations, allowing inaccurate and unverifiable information to persist and harm Plaintiff's financial reputation.

25.    .As a direct result of Defendants willful noncompliance with the FCRA, Plaintiff missed several critical financial opportunities, including:

    i.     Goldman Sachs consumer credit card, denied on March 3, 2024;

    ii.    Navy Federal Credit Union loan applications, denied on January 10, 2024, November 18, 2023, and October 3, 2023;

    iii.   U.S. Bank loan application, denied on November 9, 2023;

    iv.    Service Finance Company, denied on or near February 17, 2023;

    v.     Wells Fargo Auto, denied on April 29, 2023; and

    vi.    Various extension of consumer credit, directly caused by Defendants actions or, lack thereof.

26.    In addition to financial losses, the Plaintiff endured severe emotional distress, including anxiety and depression, requiring prescribed medication. The Defendants' actions not only compromised Plaintiff's financial standing but also inflicted lasting psychological harm.

27.    This case exemplifies the systemic failures of the Defendants and highlights the broader consequences of their profit-driven practices. Defendants disregard for the FCRA reflects a deliberate strategy to minimize compliance costs at the expense of consumer fairness and accuracy. Despite repeated notifications from the Plaintiff

regarding their legal obligations, Defendants willfully continued to disseminate inaccurate and unverifiable information, prioritizing profits over compliance.

28.    The Plaintiff's experience underscores the need for consumer reporting agencies to adhere strictly to their statutory duties. By bringing this action, Plaintiff seeks redress not only for personal harm but also to hold Defendants accountable for their systemic failures. This lawsuit aims to ensure that Defendants fulfill their obligations under the FCRA and restore trust in the credit reporting system for all consumers.

## NATURE OF COMPLAINT

29.    This legal action is brought forth for actual, statutory damages brought under the FCRA, 15 U.S.C. § 1681 *et seq*., due to Defendants, egregious and repeated violations of federal law. Inaccurate consumer credit reports do irreparable harm to the lives of consumers, The Consumer Financial Protection Bureau ("CFPB") has noted, "Inaccurate information on a consumer report can have significant consequences for consumers and may, among other things, lead them to receive products or services on less favorable terms or impede their ability to access credit or open a bank account." *Consumer Fin. Prot. Bureau,* Supervisory Highlights, (Issue 32 Spring 2024). These reports are used to make critical decisions about employment, housing, loans, and insurance.

30.    Defendants failed to complete a proper investigation into Plaintiff's disputes and refused to correct or remove patently inaccurate and unverifiable information, despite their legal obligation to do so under the FCRA. Although Defendants assert, they reserve the right to correct such information, without contacting the data

furnisher[1], they have willfully disregarded this duty[2]. As a result, the inaccurate data remained on Plaintiff's credit report, blocking access to vital financial opportunities and causing significant personal and emotional harm.

31.     Defendants relied heavily on outsourced representatives to process disputes, many of whom were subject to strict time quotas—often completing reviews in less than two minutes. These representatives lacked sufficient comprehension of the English language, as evidenced by their inability to meet TOEFL standards, and had no foundational knowledge of the FCRA. Their only task was to select pre-determined options from a drop-down menu within the e-OSCAR system.

32.     The Defendants have constituted the entirety of what inadequately trained representatives, as a "reasonable investigation." This automated, superficial process failed to account for the detailed information Plaintiff provided in dispute letters, perpetuating the inaccurate and unverifiable entries on Plaintiff's credit file.

33.     As consumer reporting agencies, Defendants are required to maintain maximum possible accuracy of the information reported and to adopt reasonable procedures, as mandated by 15 U.S.C. §§ 1681e(b) and 1681(b). Defendants must also conduct meaningful investigations of consumer disputes under 15 U.S.C. § 1681i. However, Defendants failed to meet these statutory duties, continuing to parrot inaccurate data from data furnishers without verifying its accuracy or forwarding Plaintiff's documentation for proper evaluation.

---

[1] In some instances, we are able to determine whether the disputed information should be changed or deleted without having to contact the furnisher or the vendor. After we complete our processing, we send you the results." – Experian, Dispute Process, available at Experian.com/disputeprocess.

[2] "[TransUnion will] change the information directly if it does not require verification." – TransUnion, Credit Disputes FAQ, available at https://www.transunion.com/credit-disputes/credit-disputes-faq#top-dispute-faqs-8.

34.     Throughout the period relevant to this complaint, Defendants acted—and continue to act—through their agents, employees, officers, directors, and outsourced representatives, whose actions are central to this complaint. By delegating critical dispute investigations to unqualified foreign agents with no substantive understanding of the FCRA, Defendants have not only violated statutory requirements but also demonstrated systemic indifference toward consumers financial well-being.

35.     Should the Court find that Defendants willfully or negligently failed to meet their statutory obligations, Plaintiff is entitled to relief under 15 U.S.C. § 1681o for negligent noncompliance and 15 U.S.C. § 1681n for willful noncompliance. Plaintiff alleges that damages in this case exceed $75,000.00, exclusive of interest and costs.

36.     The FCRA's mandates are clear and essential to ensuring the integrity of consumer credit reporting. This action seeks to hold Defendants accountable for their repeated breaches of the FCRA, compelling them to adopt and maintain lawful procedures. Plaintiff also seeks appropriate damages to remedy the harm caused by Defendants' unlawful conduct, ensuring that consumers rights and financial reputations are protected as intended by Congress.

## JURSIDICTION AND VENUE

37.     This action arises under the FCRA and is brought pursuant to its mandates. Subject matter jurisdiction is conferred upon this Honorable Court by 15 U.S.C. § 1681 *et seq*., and 28 U.S.C. § 1331 and N.D. Ohio Civ. R. 3.8, as this action arises directly under federal law.

38.     The Plaintiff seeks damages that reflect the substantial personal and financial harm they have endured. The amount in controversy exceeds $75,000, exclusive of interest and costs, thus establishing jurisdiction under 28 U.S.C. § 1332 due to the diversity of parties and the amount in dispute.

39.     The FCRA was enacted to protect consumers against unjust, unreasonable, biased, inaccurate, and unverifiable credit reporting practices. Its provisions are not merely guidelines but are foundational principles of consumer protection in the sphere of credit reporting.

40.     Venue is proper in this Honorable Court pursuant to 28 U.S.C. § 1391. The Defendants conducts significant business within the Northern District of Ohio, Toledo, and a major part of the events or omissions forming the basis of the claim occurred within this jurisdiction.

41.     Plaintiff is an adult consumer residing in Toledo, Ohio, within the Northern District of Ohio.

42.     Plaintiff, Janene Pruitt, is a resident of this District and Division, and each of the Defendants transact business within this District and Division.

**PARTIES**

43.     The Plaintiff, at all pertinent times, qualifies as a natural person and "consumer" under the FCRA, specifically as defined per 15 U.S.C. § 1681a(c).

44.     Equifax, Experian, and TransUnion are recognized as a "nationwide consumer reporting agency" ("NCRA") under 15 U.S.C. § 1681a(p) and 12 C.F.R. § 1022.130(h).

*THE NATIONWIDE CONSUMER REPORTING AGENCIES*

45.     The Defendant, Equifax is formed under Georgia laws and is a limited liability company with the principal place of business at 1550 Peachtree Street Northeast, Atlanta, Georgia 30309.

46.     The Defendant, Experian is an Ohio corporation formed under Ohio laws with a principal place of business at 475 Anton Boulevard, Costa Mesa, California 92626.

47.     TransUnion under Delaware laws, the Defendant is a limited liability company with its principal business address at 555 West Adams Street, Chicago, Illinois 60661.

48.     The Defendants core business entails compiling and analyzing consumer data. This information, vital to various sectors, is then provided as consumer reports to third parties, helping them assess consumers' creditworthiness. Such operations have a nationwide span, serving consumers across many states, including California.

49.     With operations that touch the lives of nearly every American adult, the Defendants holds a paramount responsibility to maintain accuracy, fairness, and transparency in all their reports.

**GENERAL FACTUAL ALLEGATIONS SUPPORTING CAUSE OF ACTION**

50.     The Plaintiff has pursued all reasonable measures before seeking relief from this Honorable Court, engaging in good faith efforts to address the issues out-of-court.

51.     "Congress enacted FCRA in 1980 out of concerns about abuses in the consumer reporting industry." *See* S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec.

35941 (1970) (statement of Sen. Proxmire); *Id.* at 36570 (statement of Rep. Sullivan). "In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth… din 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

52.　　Section 1681e(b) sets forth the Defendants overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Id.*

53.　　Section 1681i(a), on the other hand, requires much more from the Defendants after a consumer has placed it on notice of an inaccuracy of dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

54.　　Section 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir.

1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

55.     It has long been the law that a CRA, such as Defendants, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the disputed item. *E.g.*, *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), on reh'g sub nom. *Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs.*, Inc., No. 1:14-cv-515-TWT- LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016). ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate").

56.     The FCRA imposes a host of requirements concerning the creation and use of consumer reports. As relevant here, the Act requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of "consumer reports, § 1681e(b); to notify providers and users of consumer information of their responsibilities under the Act. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 335, 136 S. Ct. 1540, 1545, 194 L. Ed. 2d 635 (2016), as revised (May 24, 2016).

57.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

58.     Further, as Defendants are aware, this circuit court has held that even

though the term "investigation" is not used in section 1681e(b), Defendants have an

inflexible duty to conduct a reasonable initial investigation pursuant to sections 1681e(b)

and 1681i(a). This duty is "central" to the Defendants duties of care under that portion of

the Act:

> "[I]naccurate or misleading" standard using reasoning largely analogous to that
> set forth above. *See, e.g., Schweitzer v. Equifax Info. Sols., Inc.*, 441 F. App'x 896,
> 902 (3d Cir. 2011); *Dalton*, 257 F.3d at 415; *Sepulvado v. CSC Credit Servs., Inc.*,
> 158 F.3d 890, 895–96 (5th Cir. 1998); *Koropoulos v. Credit Bureau, Inc.*, 734
> F.2d 37, 39–43 (D.C. Cir. 1984); *cf. Carvalho v. Equifax Info. Servs., LLC*, 629
> F.3d 876, 890–91 (9th Cir. 2010). And of the two circuits to decline to rule one
> way or the other on the issue, one of those circuits nonetheless took care to
> emphasize that the "better reading" of the statute is the one we adopt here. *See,
> Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1281 (11th Cir. 2017) ("[T]he better
> reading of the Act requires that credit reports be both accurate and not
> misleading[.]").

*Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 943 (6th Cir. 2020).

59.     It has long been the law—since 1970—that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that
> may indicate systematic problems (by virtue of information from consumers,
> report users, from periodic review of its reporting system, or otherwise), it must
> review its procedures for assuring accuracy and take any necessary steps to avoid
> future problems. Similarly, it should establish procedures to avoid reporting
> information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING
ACT (July 2011), at 67.[3]

60.     The investigations into Plaintiff's disputes must be substantial. Not

superficial. As the Fourth Circuit explained in *Johnson v. MBNA*, 357 F.3d 426, 430 (4th

Cir. 2004):

---

[3] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair- credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed. 2000); *see* Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

***Plaintiff, Janene Pruitt, Discover's Inaccurate, Derogatory and Unverifiable Information Reporting on Her Credit Reports.***

61.     Plaintiff, Janene Pruitt, was married, until her departure from her husband. She is now single mother, solely responsible for her children.

62.     She applied for an extension of consumer credit through, Navy Federal Credit Union on January 10, 2024, for pursuing further education, and necessities for her and her family.

63.     She was denied financing.

64.     Ms. Pruitt was denied solely because the credit union found inaccurate and derogatory information on her credit report from the Defendants, unbeknownst to her.

65.     The inaccurate information being reported on her credit report included:

i.      1STPROGRESS/TSYS/VT 544303XXXXXXXXXX [account numbers partially redacted pursuant to Fed. R. Civ. P. 5.2.], herein referred to as 1STPROGRESS, this account was paid in full on time;

ii.     CAPITAL ONE 5178XXXXXXXXX [account numbers partially redacted pursuant to Fed. R. Civ. P. 5.2.], herein referred to as CAPITAL ONE, timely and numerous payments were made on this account;

iii.    CITI CARD/CITIBANK 51891XXXXXXXXXX [account numbers partially redacted pursuant to Fed. R. Civ. P. 5.2.], herein referred to as CITICARD, timely super-numerous payments were made on this account;

iv.     800 LOANMART/CCB 444XXXX [account numbers partially redacted pursuant to Fed. R. Civ. P. 5.2.], herein referred to as 800, this account is not associated with Ms. Pruitt, at all;

v.     DEPT OF ED/AIDVANTAGE XXXXXXXXXXXXXXXXX, [account numbers partially redacted pursuant to Fed. R. Civ. P. 5.2.], herein referred to as AIDVANTAGE, the same account being reported is misleadingly repeated numerous times, despite timely payment;

vi.     DIRECTIONS CREDIT UNION 236089XXXXX [account numbers partially redacted pursuant to Fed. R. Civ. P. 5.2.], herein referred to as DIRECTIONS, this account is not associated with Ms. Pruitt;

vii.     Ms. Pruitt's personal identifiable information ("PII"), was not only completely inaccurate, but completely misleading, such as various addresses never associated with her or her children, phone numbers and names;

viii.     Ms. Pruitt's exhaustive inquiries on her credit profile, which were never authorized from any data furnisher, including but not limited to:

a.    Capital One on November 15, 2021, May 4, 2023, May 26, 2023

b.    LP/DMS/AFFINITY, FCU/AMTR on April 5, 2022

c.    ALLY Financial on October 15, 2021, April 19, 2023, April 26, 2023, May 4, 2023, May 12, 2023, May 25, 2023

d.    Wells Fargo Bank NA on February 17, 2023

e.    Citi Cards on May 5, 2023

f.    Service Finance on February 17, 2023

g.  Flagship Credit Acceptance on April 5, 2022

ix.  In each instance, Defendants collectively and repeatedly failed to conduct a reasonable investigation into Ms. Pruitt's disputes, even after being notified of potential legal action by to their general counsel. Not once, did Defendants make any effort to cross-verify the information provided. They failed to contact data furnishers to verify simple, yet critical technical details—such as IP addresses, MAC addresses, or geographical locations—relevant to unauthorized inquiries.

x.  And how could they? By the Defendants design, each dispute was routed electronically to foreign representatives—whether in India, Chile, or the Philippines—who lacked the necessary training to conduct a meaningful investigation. These representatives are restricted from calling consumers or data furnishers, cannot send emails, and are unable to cross-reference key information. Instead, all each representative is given a cursory time to complete disputes while each detailed dispute from Ms. Pruitt's are compressed into vague codes, transmitted to data furnishers through the same system provided by Defendants. These furnishers, in turn, rely solely on internal records, perpetuating inaccuracies without proper verification

66.  Despite this, and in an effort to be proactive and mitigate damages, Ms. Pruitt took steps to remedy this problem.

67.  Firstly, the Plaintiff disputed the inaccurate information manifesting on her credit report to the Defendants, on one or more occasions during the last two years. For example, and without limitation, Ms. Pruitt, mailed a detailed dispute letter to

23

Defendants on February 9, 2023, bearing her signature, in the presence of a notary. The Defendant's collectively neglected this information, failing to ever communicate with the Plaintiff the investigational results, or if the dispute was deemed frivolous. 15 U.S.C. § 1681i(3).

68.     Secondly, she mailed a subsequent dispute mailed to the Defendants on April 10, 2023, in which the inaccurate, and now, unverifiable information persisted on her credit report, denying Ms. Pruitt of further financial opportunities.

69.     Thirdly, she submitted formal disputes through the governmental portal of the CFPB on April 11, 2023, causing further emotional distress to the Plaintiff.

70.     Fourthly, she involved the Attorney Generals of Defendants, with respect to their incorporation status, on dates better known to the Defendants bringing notice to the apparent noncompliant actions of the Defendants. There was no response.

71.     Mailed notices and disputes emphasizing FCRA violations and alleged harm caused to the Plaintiff on May 23, 2023, and the Defendants General Counsel on July 10, 2023, in the form of an affidavit under the penalty of perjury detailing the harm suffered with both her, and her family and the necessity of prescribed medication and alleged violations of the FCRA. Similarly, to the Defendants first failure on February 9, 2023, and patent negligence on April 10, 2023; There was no response, or apparent investigation undertaken by the Defendants.

72.     Each dispute mailed to the Defendants contained Ms. Pruitt's PII< including a copy of Ms. Pruitt's driver's license, social security number, and her signature, sworn under the penalty of perjury and notarized to confirm its authenticity.

73.     In each instance, where the Defendants chose to undertake a dispute with foreign representatives, whose jobs consist of "button clicking," the dispute results revealed that the inaccurate, unverifiable information had been verified.

74.     As of October 25, 2024, Defendants retention of inaccurate, unverifiable and derogatory information persisted, requiring the Plaintiff to file this complaint.

75.     Had Defendants adhered to their obligations under the FCRA, the Plaintiff would not have been denied opportunities of credit or faced harm.

**Defendants Did Not and Does Not Conduct Any Investigation of Consumer Disputes.**

76.     Unknown to Plaintiff, Ms. Pruitt, until this lawsuit, it has long been the practice of Defendants to refuse to perform the statutorily mandated FCRA investigation. Instead, Defendants delegate all action in response to consumer disputes to overseas boiler-room employees.

77.     It was not until the initiation of this lawsuit that Plaintiff, Ms. Pruitt, discovered that Defendants have long engaged in a practice of refusing to conduct the statutorily mandated investigations required under the FCRA. 15 U.S.C. § 1681i. Instead, Defendants have systematically delegated these duties to low-level overseas agents operating under high-volume, quota-based conditions, with minimal training and no foundational understanding of the FCRA, specifically boiler-room. This practice reflects Defendants deliberate disregard for their legal obligations and the rights of consumers.

78.     Defendants collectively affiliate uses low-wage employees to work quickly to process consumer dispute letters received, skimming the letters, and selecting one or a handful of codes through e-OSCAR, from a dropdown menu to best describe the consumer's detailed dispute information in two (2) digits. These include,

25

    i.     Not his/hers;

    ii.    Claims Inaccurate Information. Did not provide specific dispute;

    iii.   Claims account closed by consumer;

    iv.   Disputes Amounts; and

    v.    Disputes present/previous Account Status/History.

79.    These dispute agents tasked with investigation into consumer disputes are not allowed to do any of the following: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than five 5 minutes per dispute.

80.    The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to manage the process of reading consumer dispute letters, selecting one of a handful of common dispute codes from a drop-down menu, and then clicking that code.

81.    Once the data, the Plaintiff's multi-length dispute, including exhibits, and an affidavit is than reduced to nothing more than a digitized codes. After that, the Defendants involvement is over.

82.    Defendants, therefore, did not internally conduct any reinvestigation of Plaintiff's disputes, or timely complete investigations within the statutory required time.

83.    In *Sarver v. Experian Info. Sols.*, 390 F.3d 969 (7th Cir. 2004), the Seventh Circuit held that the question of reasonableness in the context of procedures is "normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question." The Defendants failure to conduct any investigation,

despite their legal and industry obligations to ensure accurate reporting, demonstrates a breach of their duty to the Plaintiff.

84.     Under such circumstances, the Defendants became obligated under the FCRA to investigate Plaintiff's disputes. They did not. The Defendants held an inflexible obligation to complete a reasonable investigation into the inaccurate, and unverifiable information. They failed, repeatedly.

### Defendants Manipulation of Internal Procedures and Pattern of Fines for Unreasonable Practices.

85.     Upon Ms. Pruitt's dispute of the derogatory accounts, Defendants, on or about a date(s) better known to them, forwarded the dispute to the data furnishers, using an electronic system called e-OSCAR. The Defendants—are the ones responsible for creating, implementing, and employing the e-OSCAR system.

86.     e-OSCAR is an industry-wide process where disputes are electronically communicated to furnishers, and dispute results are sent back to the Defendant.

87.     Through a "Data Furnishment Agreement," and access to Metro-2 reporting privileges, the data furnishers, or creditors of the disputed information, accept and receive disputes from the Defendant through Automated Consumer Dispute Verification ("ACDV").

88.     The Defendants, fully conscious of the duties and obligations under the FCRA, chose deliberate silence and inaction. They failed to address the Plaintiff's repeated notifications about inaccuracies, unverifiable details, and outright fraudulent information present in the Plaintiff's credit report. This has caused the Plaintiff significant harm while showcasing a disregard for the FCRA's principles. Instead, and while

knowingly committing automated investigations, devoid of *any* intrinsic investigation beyond a mere "button push" verification through e-OSCAR, and ACDV forms.

89.     The Defendants willfully pursued profits over adhering to *any* fair, accurate, or remotely reasonable procedure.

90.     This alleged prioritization of profits over any semblance of reason to the FCRA is not without evidence. Rohit Chopra, the director of the CFPB asserted, "We will be exploring new rules to ensure that they [Defendants] are following the law, rather than cutting corners to fuel their profit model." *Consumer Fin. Prot. Bureau*, CFPB Releases Report Detailing Consumer Complaint Response Deficiencies of the Big Three Credit Bureaus (Jan. 5, 2022).

91.     The job of the Defendants outsourced "dispute" department, even if titled "investigator," is solely and only data entry. No matter how detailed the Plaintiff's mailed dispute, submission through the CFPB, or Attorney Generals, the Defendants merely translate the dispute into two-digit codes, and transfers said information through ACDV. The employees of the Defendants operate under a quota system whereby each outsourced data input is expected to process all of the disputes of an individual consumer in less than 5 minutes. Worse still, the "codes" used by the Defendants and the data furnishers are limited in number and rarely, if at all, describe the factual basis for Plaintiff's disputes.

92.     The Defendants response to criticism over the documented failures to forward documentation is to rely on a field in the ACDV form that permits a "free text" comment to be entered by the foreign representative, which is called the "FCRA Relevant Information field." This box is limited to one line and a fixed number of characters. The

Defendants procedures manuals offer almost no instructions for their clerks as to what information should be placed in this one-line text field.

93.     It is a well-established fact that the credit reporting industry's primary paying clients are not consumers, but creditors who furnish information to, or rely on the data maintained within, the Defendants databases. While the Defendants have expanded their offerings to include credit monitoring services, the majority of their revenue is derived directly from furnishers and other institutional users of consumer credit information. This financial relationship creates a clear conflict of interest, incentivizing the Defendants to prioritize the interests of furnishers over their statutory obligations to consumers under the FCRA.

94.     Both furnishers and Defendant's exploit a system that allows them to spend mere seconds processing a dispute, prioritizing speed over substance, rather than dedicating the minimal time necessary to conduct *any* proper investigation and ensure accurate resolution, unless you're included in the preferential list. This practice reflects a deliberate disregard for the investigatory standards required under the FCRA, further benefiting the Defendants financially at the expense of consumers rights.

95.     There is little economic incentive for Defendants to conduct thorough investigations because such efforts do not generate revenue. Proper investigations impose actual costs upon the Defendants. For the leading nationwide consumer reporting agencies, these expenses are directed toward consumers—who are not their primary customers. This structure incentivizes Defendants to prioritize cost-saving practices over their statutory obligations under the FCRA, leaving consumers vulnerable to inaccurate, unverifiable, and incomplete reporting.

96.     Defendants have developed a profit-driven model that further reduces the minimal costs associated with their so-called "investigations." Rather than absorbing these costs, Defendants charge furnishers for every dispute processed through the e-OSCAR system, transforming investigations into a revenue stream. For example, Equifax pays its foreign vendor no more than $0.80 to process each consumer dispute letter. Yet, through e-OSCAR, Defendants charge at least $0.25 per ACDV form to the data furnishers for every dispute transmitted electronically, pursuant to the data furnishment agreements with the creditors, or applicable persons. 15 U.S.C. § 1681a(b).

97.     This structure creates a financial imbalance: when Plaintiff submits disputes involving multiple inaccurate accounts—whether due to a mixed file, identity theft, or Defendants' failure to investigate—Defendants pay their outsourced vendor only a fraction of what they charge their creditor clients. In fact, the more automated disputes Defendants send through e-OSCAR, the more revenue they generate. Rather than investing in meaningful investigations, Defendants profit from the dispute process itself, incentivizing volume over accuracy in direct violation of their statutory duties under 15 U.S.C. § 1681i.

98.     In fact, Defendants strongly encourages consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (*e.g.*, "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the e-OSCAR system described below without ever touching human hands or being read by human eyes. It gets sent to a creditor-customer for its sole review and consideration.

99.     Though incorrect, Defendants, claims that it cannot direct, control, manage or reliably influence the employees of its respective third-party outsource vendor, with whom they receive compensation from, each time a dispute is received. These actions have routinely been found to be noncompliant under the FCRA.

100.    Indeed, Defendants willfully chose to prioritize profits over compliance with the FCRA, reducing the Plaintiff's factual disputes to a gamble at a casino. Whether inaccurate, unverifiable, or derogatory information would be corrected or removed was left to chance, rather than guided by reasonable investigative procedures. Defendants outsourced these essential investigatory functions to undertrained and unqualified overseas agents, who operated under strict time quotas and without sufficient knowledge of the FCRA or the disputes they were tasked to resolve.

101.    Had Defendants implemented reasonable procedures—such as conducting proper investigations into the Plaintiff's disputes and promptly correcting the inaccuracies—this action would not have been necessary. Instead, the Plaintiff's efforts to resolve these issues were left to chance, with outcomes dependent on automated processes and the superficial review of outsourced agents. Defendants failure to conduct meaningful investigations reflects a clear disregard for their statutory obligations under 1681i. Likewise, had Defendants general counsel appreciated the Plaintiff's dispute signed under the penalty of perjury, with the calculated damages as an invoice for noncompliance, this instant action would not have been brought forward.

102.    Likewise, had Defendants general counsel recognized the seriousness of the Plaintiff's disputes and acknowledged the damages resulting from their noncompliance, this case would not have been brought. Defendants repeated refusal to

address these issues, despite multiple opportunities to correct them, further underscores their bad faith and willful disregard for the FCRA's investigatory and reporting requirements.

### *Plaintiff Ms. Pruitt Suffered Actual Harm.*

103.    Defendants continued to report the inaccurate, unverifiable and derogatory account on Plaintiff's credit reports, despite being notified that this information was false.

104.    Plaintiff's attempts to resolve these matters with Defendants were to no avail.

105.    In fact, Plaintiff's credit was significantly destroyed by Defendants refusal to correct the inaccurate reporting.

106.    As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

i.      Goldman Sach's consumer credit card on March 3, 2024;

ii.     Navy Federal Credit Union on January 10, 2024, November 18, 2023, October 3, 2023;

iii.    United States Bank on Financial on November 9, 2023 (hereinafter "USBANK"); and

iv.     Undue mental anxiety and depression which necessitated prescribed medication, due to the Defendants actions or lack thereof.

v.      Stress associated with being denied credit and associated delays in applying for future credit;

vi.     Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes, etc;

  vii.  Loss of time attempting to cure the error;

  viii.  Mental anguish, stress, aggravation, and other related impairments to the

enjoyment of life; and

  ix.  Stress associated with attempting to resolve this matter.

### *Defendants Conduct Was Willful.*

107. The FCRA allows for a remedy for a "willful" violation. A willful act or

violation includes, "not only knowing violations of [the statute], but reckless ones as

well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). A "reckless" action

includes conduct whereby "the company ran a risk of violating the law substantially

greater than the risk associated with a reading that was merely careless." *Id*. at 69.

108. Proof of willfulness includes, for example, "evidence that other consumers

have lodged complaints similar to" the one made by Plaintiff and a failure to make the

correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co.*

*of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

109. As detailed above, the FCRA sections at issue here, and informative

guidance, have been around now for over 30 years. The language of section 1681e(b) has

not changed. Defendants dispute investigation obligations under sections 1681i have not

changed since at least 1997. The FCRA's caution of Defendants "grave responsibilities"

to ensure accuracy has not changed.

110.   The Defendants have received many thousands of disputes and other complaints sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

111.   Defendants knew or should have known the serious nature of this dispute and established cases in this circuit, and sisters, where they have been held liable. They use and have access to PACER to investigate and monitor such litigation.

112.   The CFPB has maintained a Consumer Complaint database since 2011. It receives a small percentage of the total consumer credit reporting complaints made nationwide. Many more complaints are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

113.   Defendants regularly receives unredacted consumer dispute details from this database.

114.   Since the database began accepting complaints, the CFPB has sent over 2,000,000 consumer credit reporting complaints to Defendants.

115.   Notably, Experian and Trans Union were labeled as the most egregious both by consumers and regulatory bodies like the CFPB.

116.   Just in the last twelve (12) months alone, Defendants have been sued by consumers alleging violations of the FCRA over 3,000 times.

117.   Most of these lawsuits alleged that the CRAs violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

118.   While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have placed the Defendants on notice of the failures of

its dispute practices and investigation procedures in ensuring accuracy, numerous federal district and circuit courts have placed Experian on notice that it may not merely "parrot" what its creditor-customer tells it if the consumer has provided a substantive and detailed dispute.

119.    Defendants have long had specific notice from courts about their expected conduct in dispute investigations. The seminal circuit court decision addressing section 1681i(a) and finding that a consumer reporting agency does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Trans Union's notice was so substantial that the court instructed the jury in a section 1681i(a) trial in which Experian was also a defendant:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed... that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

120.    Experian has also been repeatedly criticized by federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

121.    In Ohio, in 2015, a large group of state Attorneys General forced a consent order from consumer reporting agencies, by which they were required to develop

procedures necessary to comply with the FCRA. The AG Settlement required amongst many changes and mandates that the CRAs comply with § 1681i(a).[4]

122.　　As the Seventh Circuit Court of Appeals has noted, the ACDV process is often "cryptic" and "meaningless":

> It seems that Experian has a systemic problem in its limited categorization of the inquiries it receives and its cryptic notices and responses. For example, there is the meaningless communication [Plaintiff] received from Experian in response to her notice of dispute: "Using the information provided the following item was not found: Grossinger City Toyota." Another example is the opaque notice of dispute sent by Experian to U.S. Bank: "Claims Company Will Change or Delete." Moreover, in what appears to be an unresponsive form letter rather than the report of an adequate investigation into her claim, [Plaintiff] was notified that the "Paid/Was a repossession" notation would remain in her report and the only change would be the addition of: "Account closed at consumer's request."

*Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 610-611 (7th Cir. 2005).

123.　　Despite extensive statutory, judicial, regulatory, and public criticism, Defendants have deliberately chosen not to modify their dispute investigation processes, prioritizing cost savings over compliance with the FCRA. Meaningful improvements would require investing in proper investigations and oversight—expenses that Defendants are unwilling to incur, as such changes would impact their profit margins.

---

[4] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News- Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

124.    The procedures Defendants imposed on Plaintiff and similarly situated consumers pose an unjustifiable and unreasonable risk of harm. These risks—ranging from financial losses to emotional distress—could have been mitigated or entirely avoided with modest procedural changes and minimal investment. Defendants failure to implement these reasonable measures reflects a willful disregard for consumer rights and further exposes the systemic deficiencies within their dispute resolution processes.

## CAUSE OF ACTIONS

### COUNT I
### Violation of Federal Law under the FCRA, 15 U.S.C. § 1681e(b)

125.    Plaintiff Ms. Pruitt, realleges and incorporates the foregoing paragraphs as if fully set out herein.

126.    Defendants willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files it published and maintained concerning Ms. Pruitt.

127.    As a result of this conduct, action and inaction of Defendants, Ms. Pruitt, suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, and denial of a loan.

128.    Even after Plaintiff's disputes put Defendants on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of its creditor-customers, Defendants ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring the maximum possible accuracy of Plaintiff's credit reports.

129.    Defendants furnished multiple consumer reports to third parties containing the inaccurate tradeline information and it did so after receiving notice of these inaccuracies.

130.    Defendants conduct, action and inaction were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

131.    As a result of Defendants violations of 15 U.S.C. § 1681e(b), Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

132.    Ms. Pruitt is entitled to recover her applicable costs and attorney's fees from the Defendant, if one is retained, in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### Violation of Federal Law under the FCRA, 15 U.S.C. § 1681i

133.    Plaintiff Ms. Pruitt, realleges and incorporates the foregoing paragraphs as if fully set out herein.

134.    Defendants willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files it published and maintained concerning Ms. Pruitt.

135.    As a result of this conduct, action and inaction of Defendants, Ms. Pruitt suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit,

reduction in credit scores, denial of a loan, and prescribed medication to handle a medical condition.

136.    As a result of Defendants violations of 15 U.S.C. § 1681i, Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

137.    Defendants conduct, action, and inaction was willful, rendering Defendants liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

138.    Plaintiff Ms. Pruitt is entitled to recover her applicable costs and attorneys' fees from Defendants, if one is appointed, in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Ms. Pruitt, hereby demands a trial by jury on all issues triable by jury

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against the Defendants as follows:

i.      *Actual Damages*: Pursuant to 15 U.S.C. § 1681o for Defendants negligent violations of the FCRA, with amounts reflecting the harm caused by the inaccurate reporting throughout Defendants operational procedures, and unreasonable reliance on foreign entities.

ii. *Statutory Damages*: For documented noncompliance and violations of the FCRA, as specified in the detailed invoices provided to each Defendant, which were ignored, indicating willful negligence:

    a. Equifax Information Services, LLC: $169,000.00

    b. Experian Information Solutions, Inc.: $235,000.00

    c. TransUnion, LLC: $81,000.00

iii. *Interest*: Prejudgment and post-judgment interest at the statutory rate, to compensate Plaintiff for the delayed resolution of these claims.

iv. Attorney's Fees and Costs: Plaintiff seeks applicable attorney's fees, if one is appointed and litigation costs, recoverable under 15 U.S.C. § 1681n.

December 17, 2024            Respectfully submitted,

           */s/* Janene Pruitt
           Janene Pruitt
           2336 South Avenue
           Toledo, Ohio 43609
           telephone: (419) 490-5398
           email: JanenePruitt@proton.me

           *Pro se Plaintiff*

# VERIFICATION

I, JANENE PRUITT, being duly sworn, declare and affirm the following under the penalty of perjury:

1. I am the Plaintiff in the above-entitled action.
2. I have read the foregoing Verified Complaint, and I affirm that the facts stated therein are true to the best of my knowledge, understanding, and belief.
3. Where statements in the Complaint are made on information and belief, I believe them to be the absolute truth based on information and belief provided to me.
4. The intent of this Complaint and Verification is to seek just relief from this Honorable Court and to uphold the sanctity and integrity of the judicial process in good faith and cause.
5. I am fully aware that making false statements in this verification is punishable under 18 U.S.C. § 1621 pertaining to perjury.
6. I understand that I am affirming the truthfulness of the statements contained in the Verified Complaint under penalty of perjury.

STATE OF OHIO

COUNTY OF LUCAS

SUBSCRIBED AND SWORN TO BEFORE ME, on the 17th day of December, 2024

Signature _____ (Seal)

_____ (Signature)

JANENE PRUITT

NOTARY PUBLIC
My Commission expires:

3/22/2026

**TONYA I. JACKSON**
Notary Public, State of Ohio
My Commission Expires
May 22, 2026
COMMISSION: 2016-RE-589362